UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                        :
UNITED STATES OF AMERICA
                                        :
        -v.-
                                        :        22 Cr. 20 (PGG)
ALEXANDER GULKAROV *et al.*,
                                        :
                Defendants.
                                        :
-------------------------------------------------------------x
```

<u>**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO ALEXANDER GULKAROV AND ROMAN ISRAILOV'S
PRETRIAL MOTIONS**</u>

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Mathew Andrews
Louis A. Pellegrino
Assistant United States Attorneys
        -Of Counsel-

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 4

BACKGROUND ............................................................................................................... 4

SUMMARY OF THE ARGUMENT ................................................................................. 8

ARGUMENT .................................................................................................................... 8

   I.   The Court Should Deny the Moving Defendants' Motion to "Partially Dismiss" Count One of the Indictment ........................................................................................ 8

     A.   Applicable Law .................................................................................................. 9

     B.   Background Regarding Fraudulent Incorporation and New York's No-Fault Laws . 11

     C.   Relevant Facts .................................................................................................. 17

     D.   Discussion ........................................................................................................ 19

       1.   The Moving Defendants' Challenge to the *Mallela* Fraudulent Incorporation Theory in Count One Ignores Binding New York and Second Circuit Precedent .......... 19

       2.   The Moving Defendants Cite No Cases on Point ................................................... 24

   II.   The Court Should Deny the Moving Defendants' Motion to Suppress Recordings of Calls on Which They Were Intercepted During the Khaimov Wire and All Evidence Derived from the Intercepted Calls ...................................................................................... 27

     A.   Relevant Facts .................................................................................................. 28

       1.   Background of the Investigation ............................................................................. 28

       2.   The Khaimov Wire .................................................................................................. 31

     B.   Relevant Law ................................................................................................... 36

     C.   Discussion ........................................................................................................ 39

   III.   The Court Should Deny Israilov's Motion to Sever His Case from Counts Four and Five of the Indictment on the Basis of Spillover Prejudice ............................................. 41

     A.   Applicable Law ................................................................................................. 42

     B.   Discussion ........................................................................................................ 45

       1.   Severance is Not Warranted .................................................................................... 45

       2.   The Defendants' *Bruton* and *Crawford* Claims Are Meritless ............................. 48

CONCLUSION ................................................................................................................ 51

# TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273 (E.D.N.Y. 2013) ............................................. 14

*Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358 (E.D.N.Y. 2012) ................................................ 15

*Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389 (2019) ......................... 14

*Gov't Emps. Ins. Co. v. Ajudua*, No. 15-CV-5199 (MKB), 2018 WL 7252961 (E.D.N.Y. Dec. 18, 2018), ........................................................................................................................................ 15

*Bruton v. United States*, 391 U.S. 123 (1968), ............................................................................. 50

*Costello v. United States*, 350 U.S. 359 (1956). .......................................................................... 10

*Fischer v. United States*, 529 U.S. 667 (2000) ............................................................................ 26

*Gov't Emps. Ins. Co. v. Avanguard Med. Grp., PLLC*, 27 N.Y.3d 22 (2016) ............................ 25

*Hamling v. United States*, 418 U.S. 87 (1974) ............................................................................. 10

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243 (E.D.N.Y. 2012 ................. 14

*Neder v. United States*, 527 U.S. 1 (1999). ................................................................................. 26

*Richardson v. Marsh*, 481 U.S. 200 (1987) ........................................................................... 43, 50

*State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500 (2d Cir.) ...................................... passim

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012) ............................................................... 10

*United States v. Attanasio*, 870 F.2d 809 (2d Cir. 1989*)*. ........................................................... 42

*United States v. Blount*, 291 F.3d 201 (2d Cir. 2002) .................................................................. 44

*United States* v. *Cardascia*, 951 F.2d 474 (2d Cir. 1991) ........................................................... 43

*United States* v. *Carson*, 702 F.2d 351 (2d Cir. 1983) ............................................................... 45

*United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989) ....................................................... 43

*United States v. Concepcion*, 579 F.3d 214 (2d Cir. 2009) ........................................................ 37

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001)). ................................................ 10, 11

*United States* v. *DeSalvo*, 797 F. Supp. 159 (E.D.N.Y. 1992) .................................................... 47

*United States* v. *Diaz*, 176 F.3d 52, 102 (2d Cir. 1999) ...................................................... 37, 44

*United States* v. *Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ...................................................... 38

*United States* v. *Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) ....................................................... 45

*United States v. Fleishman*, No. 11 Cr. 32(JSR), 2011 WL 4000987 (S.D.N.Y. Aug. 31, 2011) 38

*United States v. Gabinskaya,* 829 F.3d 127 (2d Cir. 2016). ................................. 16, 21, 23, 24

*United States* v. *Hernandez*, 85 F.3d 1023 (2d Cir. 1996) ......................................................... 45

*United States* v. *Hernandez*, 980 F.2d 868 (2d Cir. 1992) ......................................................... 10

*United States v. Johnson*, 945 F.3d 60 (2d Cir. 2019) ............................................................... 26

*United States v. Kahn*, 415 U.S. 143 (1974)). ............................................................................. 37

*United States* v. *Lanza*, 790 F.2d 1015 (2d Cir. 1986) ............................................................... 44

*United States* v. *Locascio*, 6 F.3d 924 (2d Cir. 1993) ................................................................ 44

*United States v. Miller*, 116 F.3d 641 (2d Cir. 1997) ............................................................ 38, 42

*United States v. Molina*, 789 F. Supp. 106 (E.D.N.Y. 1992), *aff'd*, 48 F.3d 1213 (2d Cir. 1994) 48

*United States* v. *Panza*, 750 F.2d 1141 (2d Cir. 1984) ............................................................... 44

*United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119 (S.D.N.Y. Apr. 1, 2022) ........ 11

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008) ............................................................ 45

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993). .................................................................... 43

ii

*United States v. Rose*, No. 19 CR. 789 (PGG), 2021 WL 2117119 (S.D.N.Y. May 24, 2021)... 28, 41

*United States* v. *Salameh*, 152 F.3d 88 (2d Cir. 1998) ................................................. 42, 43, 44

*United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004)............................................................ 43

*United States v. Scala*, 388 F. Supp. 2d 396 (S.D.N.Y. 2005 ................................................... 38

*United States v. Serrano*, 450 F. Supp. 2d 227 (S.D.N.Y. 2006) ............................................ 37

*United States* v. *Spinelli*, 352 F.3d 48 (2d Cir. 2003) ............................................................ 44

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) .................................................... 10

*United States v. Stein*, 428 F.Supp.2d 138 (S.D.N.Y. 2006) ................................................... 47

*United States v. Steinberg*, 525 F.2d 1126 (2d Cir. 1975) ....................................................... 38

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ................................................. 48, 49, 50

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001)......................................... 37, 38

*United States* v. *Turoff*, 853 F.2d 1037 (2d Cir. 1988) ........................................................... 43

*United States v. Wilkinson*, 754 F.2d 1427 (2d Cir. 1985) ....................................................... 38

*United States v. Young*, 822 F.2d 1234 (2d Cir. 1987) ............................................................ 38

*United States v. Zarrab*, No. 15 CR 867(RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016).... 9

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013). ........................... 15, 21, 22

*Zafiro* v. *United States*, 506 U.S. 534 (1993) ........................................... 42, 43, 44, 45

**Statutes**

11 N.Y.C.R.R. § 65-3.16(a)(12)). .............................................................................................. 12

11 NYCRR 65-3.16 (a) (12) ...................................................................................................... 14

18 U.S.C. § 2510(11). ................................................................................................................ 36

18 U.S.C. § 2518(3). .................................................................................................................. 37

N.Y. Ins. Law §§ 5101 ........................................................................................................ 11, 12

**Rules**

Rule 7 of the Federal Rules of Criminal Procedure. .................................................................. 10

Rule 14 of the Federal Rules of Criminal Procedure ................................................................. 42

Rule 8 of the Federal Rules of Criminal Procedure ................................................................... 42

## PRELIMINARY STATEMENT

The Government respectfully submits this Memorandum of Law in response to the pretrial motions (the "Motions") filed by defendants Alexander Gulkarov and Roman Israilov (collectively, the "Moving Defendants"). The Moving Defendants jointly seek: (1) to partially dismiss that portion of Count One of the Indictment that alleges conspiracy to commit health care fraud on the basis that the defendants conspired to conceal ownership and control of the medical professional corporations at issue in this case; and (2) to suppress the wiretap evidence from defendant Peter Khaimov's communications.  Separately, (3) Israilov alone seeks to sever his case from the obstruction and false statements charges in Counts Four and Five of the Indictment on the basis that those charges do not pertain to him, and will cause "spillover prejudice" if he is tried together with the defendants that are charged in those counts.  For the reasons that follow, the Motions should be denied in their entirety.

## BACKGROUND

The Court is well-versed in the record given three years of motions, pleas, and sentencings. The instant prosecution arises out of a multi-year federal investigation into a widespread bribery, healthcare fraud, and money laundering scheme operating throughout the New York and New Jersey area. On November 6, 2019, a grand jury sitting in this district returned an indictment charging 27 defendants in connection with the scheme. *See United States v. Rose et al.*, 19 Cr. 789, Dkt. No. 1 (the "*Rose* Indictment"). As alleged, Rose and his co-conspirators paid hundreds of thousands of dollars to employees or agents of hospitals, medical service providers, police officers, and 911 operators employed by the New York Police Department ("NYPD"), and other entities (collectively, the "lead sources") for the protected, confidential information of tens of thousands of motor vehicle accident victims in New York,

4

New Jersey, and elsewhere. *Id.* ¶¶ 1, 8. Rose and his co-conspirators then contacted the victims and made false representations to steer the victims to receive medical treatment and consultation from a select "network" of clinics and lawyers in New York, New Jersey, and elsewhere. *Id.* In reality, these clinics and lawyers were handpicked by Rose and his co-conspirators because the clinics and lawyers were paying illegal kickbacks to Rose and the co-conspirators in exchange for the referrals. *Id.* ¶ 3.

The *Rose* Indictment was not the end of the Government's investigation. The Government continued to investigate others involved in the conduct charged in the *Rose* Indictment—in particular, corrupt doctors, clinic owners, and attorneys who participated in the scheme. Approximately two years later, on or about January 11, 2022, the grand jury returned two additional indictments charging 13 individuals with, among other things, conspiracy to commit healthcare fraud, money laundering, and bribery, in *United States v. Gulkarov et al.*, 22 Cr. 20 (the "*Gulkarov* Indictment") and *United States v. Pierre et al.*, 22 Cr. 19 (the "*Pierre* Indictment").

Alexander Gulkarov and Roman Israilov are among the defendants charged in the *Gulkarov* Indictment (collectively, the "*Gulkarov* Conspirators"). As alleged, the *Gulkarov* Conspirators participated in a criminal scheme to exploit insurance programs designed to protect motor vehicle accident victims (the "No-Fault Scheme"). *See Gulkarov* Indictment ¶ 1. Under New York law, every vehicle registered in New York State must have no-fault automobile insurance, which enables the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault (the "No-Fault Law"). ¶ 6. In order to be eligible for reimbursement under the No-Fault Law, however, all medical clinics in New York State must be incorporated, owned, operated, and/or controlled by a licensed medical practitioner. ¶ 7.

Gulkarov and Israilov were among the leaders of the *Gulkarov* Conspirators. ¶ 8.   As alleged in the Indictment, Gulkarov and Israilov – who are not licensed medical practitioners – owned, operated, and controlled the No-Fault Clinics that engaged in fraudulent billing for unnecessary and excessive medical treatment under the No-Fault Law (the "Clinic Controllers"). ¶ 8.  The Clinic Controllers also engaged in multiple types of money laundering to conceal the proceeds of those crimes, and financed a widespread bribery and kickback scheme to bring patients into the Clinics.  *Id.*

In order to take advantage of the patient friendly provisions of the No-Fault Law, Gulkarov, Israilov, and others recruited over half a dozen medical practitioners – including medical doctors, chiropractors, and acupuncturists – to open the No-Fault Clinics between in or about 2014 up to and including in or about 2021. ¶ 14.  While purporting to be legitimate medical care clinics specializing in treating patients, the No-Fault Clinics were not owned, operated, and controlled by licensed medical practitioners.  Instead, the Clinic Controllers were the actual owners, operators, and controllers of the Clinics.  ¶ 14.  For instance, the Clinic Controllers took upwards of 90% of the No- Fault Clinics' proceeds; possessed the checkbooks for the Clinics' bank accounts; caused the No-Fault Physicians to pre-sign hundreds of blank checks from these accounts; controlled the debit and credit cards for the Clinics; possessed signature stamps bearing the No-Fault Physicians' signatures; controlled hiring and firing of the Clinics' employees; invested the initial funds to establish the No-Fault Clinics; controlled where to open new Clinics; negotiated the rent for the Clinics' leases; sourced and paid for the Clinics' equipment; created the bills that were sent to the insurance companies; and chose the attorneys who would represent the No-Fault Physicians in arbitration, litigation, and sworn depositions before insurance companies.  *Id.*

The Clinic Controllers further caused the captive No-Fault Physicians to routinely bill automobile insurance companies for medical treatments that were (i) never provided, (ii) unnecessary or excessive because the Patients did not medically need the treatments; and/or (iii) were more serious treatments than the Patients actually received. ¶ 16.  In addition to receiving upwards of 90% of the proceeds of the No-Fault Clinics, the Clinic Controllers also owned the billing company that filed the No-Fault Physicians' medically unnecessary claims (the "No-Fault Billing Company") and the pharmacies that filled the No-Fault Physicians' medically unnecessary prescriptions (the "No-Fault Pharmacies"). ¶ 18.  The No-Fault Physicians did not have a choice in which billing company or pharmacies they could use. *Id.* The Clinic Controllers required them to use the No-Fault Billing Company and No-Fault Pharmacies as part of the scheme. *Id.*

Further, the Clinic Controllers arranged for the No-Fault Physicians to lie under oath to insurance companies. ¶ 19.  Under the No-Fault Law, insurance carriers have the right to subject medical providers to Examinations Under Oath ("EUOs") when the carriers suspect that providers have submitted fraudulent claims.  *Id.*  During this process, the physician is sworn in under oath and asked questions relevant to the claim at hand, including whether their medical practice is under the control of non-physicians.  *Id.* The Clinic Controllers required the No-Fault Physicians to employ a particular collections attorney (the "Collections Attorney") and his law firm to represent the No-Fault Physicians in EUOs. ¶ 20. The Clinic Controllers, No-Fault Physicians, and the Collections Attorney were aware that insurance companies would deny reimbursement for the No-Fault Clinics if the No-Fault Physicians testified truthfully about, among other things, the Clinic Controllers' control of the Clinics. *Id.* The Clinic Controllers and the Collections Attorney accordingly arranged for the No-Fault Physicians to falsely state under oath, among other things, the various ways that the No-Fault Physicians purportedly controlled the No-Fault Clinics, when

in actuality, the Clinic Controllers controlled all aspects of the Clinics' medical and business operations.  *Id.*

In fact, the evidence will show that the Collections Attorney and Gulkarov spoke openly about the fact that they were committing fraud regarding this process. ¶ 22.  In one example, in or about 2020, Gulkarov proposed to the Collections Attorney that they should cease billing insurance companies under the No-Fault Law because the companies were refusing to pay. *Id.* Instead, Gulkarov proposed that they solely treat victims receiving insurance benefits under the federal government's Medicaid program.  The Collections Attorney then responded: "Then next stop is jail." *Id.*

## SUMMARY OF THE ARGUMENT

## ARGUMENT

### I.  The Court Should Deny the Moving Defendants' Motion to "Partially Dismiss" Count One of the Indictment

In Count One of the Indictment, the Government alleges, *inter alia*, that non-physicians Gulkarov and Israilov committed health care fraud by fraudulently owning, controlling, and incorporating multiple medical clinics that specialized in treating no-fault automobile accident victims.[1] As part of the scheme, Gulkarov and Israilov coached nearly a dozen medical practitioners to lie to insurance companies under oath for years in order to hide their illegal operation of the clinics.

The Moving Defendants now argue that those years of lies and perjury were unnecessary because it is not illegal for a non-physician to own a medical practice.  In doing so, the Moving Defendants assert that non-physician ownership is not "essential" to the bargain between insurer

---

[1] For ease of reference, the Government refers to this theory in this brief as the "fraudulent incorporation" theory.

8

and insured, and therefore the Moving Defendants were entitled to lie to insurance companies about the ownership and control of the No-Fault Clinics. *See* Gulkarov Mot. at 15 ("the false representation alleged here—that only licensed health care professionals owned the no fault clinics—is not a sufficient basis to establish federal health care fraud because that misrepresentation is not even part of the bargain between the parties, and *certainly* does not go to the core of the bargain between the insurer and the insured.").

But as discussed below, New York and federal law squarely holds to the contrary. Indeed, because no case law supports the Moving Defendants' arguments on this issue, the Moving Defendants instead urge this Court to disregard controlling precedent by relying on factually unrelated cases that have little persuasive value, because they involve disputes dealing with misrepresentations by stationary salesmen, letter shop owners, and construction contractors, among others.  Accordingly, the Court should deny the Moving Defendants' motion to partially dismiss Count One as meritless.[2]

## A.  Applicable Law

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Zarrab*, No. 15 CR 867(RMB), 2016 WL 6820737, at *2 (S.D.N.Y. Oct. 17, 2016) (quoting *United States v. De La*

---

[2] Although the Moving Defendants have styled their motion as a "partial motion to dismiss" Count One, what the Moving Defendant really appear to be seeking is not partial dismissal of the fraud charge in Count One, but rather, preclusion of a particular category of evidence that the Government will rely upon to *prove* that fraud offense at trial.  *See e.g.,* Gulkarov Mot. at 8 ("One of the three false statements specified by the government as a basis for conviction of the fraud charge is, as demonstrated below, legally insufficient to sustain a fraud charge").  To the extent that the Court construes the Moving Defendants' motion as a motion to preclude evidence rather than as a motion to dismiss, such a motion should be swiftly rejected for all the same reasons and based on the same law set forth in the Government's opposition to the motion to dismiss below.

*Pava*, 268 F.3d 157, 165 (2d Cir. 2001)). Indeed, it is well-settled that "[a]n indictment returned

by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial

of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

Under the Federal Rules of Criminal Procedure, an indictment "must be a plain, concise,

and definite written statement of the essential facts constituting the offense charged" and must

include the "statute, rule, regulation, or other provision of law that the defendant is alleged to

have violated." Fed. R. Crim. P. 7(c)(1). In other words, "an indictment is sufficient if it 'first,

contains the elements of the offense charged and fairly informs a defendant of the charge against

which he must defend, and, second, enables him to plead an acquittal or conviction in bar of

future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). To

state an offense, the Second Circuit has "often stated that an indictment need do little more than

to track the language of the statute charged and state the time and place (in approximate terms)

of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal

quotation marks omitted).

When considering whether a count states an offense, "all allegations in the indictment

[are taken] as true." *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012). Moreover, the

indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d

Cir. 1992), and "must be read to include facts which are necessarily implied by the specific

allegations made," *Stavroulakis*, 952 F.2d at 693 (internal quotation marks omitted). Ultimately,

an indictment "need not be perfect, and common sense and reason are more important than

technicalities." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001).

Accordingly, a "defendant faces a high standard in seeking to dismiss an indictment" for

failure to state an offense. *United States v. Pham*, No. 12 Cr. 423 (AJN), 2022 WL 993119, at *3

(S.D.N.Y. Apr. 1, 2022) (internal quotation marks omitted). Where, as here, the charging

instrument meets the basic requirements, dismissal is an "extraordinary remedy reserved only for

extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*,

268 F.3d 157, 165 (2d Cir. 2001) (internal quotation marks omitted).[3]

### B.  Background Regarding Fraudulent Incorporation and New York's No-Fault Laws

The relevant history of New York's No-Fault Regime—and the controlling case law

interpreting the statute—is set forth at length in the Second Circuit and New York Court of

Appeal's decisions in *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 502 (2d Cir.),

*certified question accepted*, 3 N.Y.3d 687, 818 N.E.2d 647 (2004), *and certified question*

*answered sub nom. State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 4 N.Y.3d 313, 827 N.E.2d

758 (2005). "In 1973, the New York State Legislature passed the precursor to today's

Comprehensive Motor Vehicle Insurance Reparations Act, see N.Y. Ins. Law §§ 5101 et seq.

(formerly N.Y. Ins. Law §§ 670 et seq.), supplanting the state's common law tort remedies for

most injuries associated with automobile accidents with a no-fault insurance scheme." *Mallela*,

372 F.3d at 502. "The purpose of the Act was to create a simple, efficient system that would

provide prompt compensation to accident victims without regard to fault, and in that way reduce

costs for both courts and insureds." *Id.* "The Act permits injured parties to recover benefits from

---

[3] In seeking to partially dismiss Count One, the Moving Defendants do not argue—nor could they—that Count One suffers from any pleading deficiency, nor that it fails in any way other than that articulated above to meet the lenient standards for stating the offense of health care fraud. Indeed, Count One "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime." *Stavroulakis,* 952 F.2d at 693. It "fairly inform[s the] defendant of the charge against which he must defend" and "enable[s] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. And it includes "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

insurers for 'basic economic loss,' including medical expenses, that arise out of the use or operation of a covered motor vehicle." *Id.* (citing N.Y. Ins. Law § 5102). The Superintendent of Insurance promulgated regulations to implement this statute, the key regulation of which sets forth:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

*Id.* at 503 (quoting 11 N.Y.C.R.R. § 65-3.16(a)(12)). As such, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.  In contrast, unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services. *See* New York Education Law §§ 6509-a; 6531. N.Y. Business Corporation Law § 1507.

These regulations were the basis of the litigation in *Mallela*. There, State Farm Insurance Company filed a federal civil lawsuit alleging, among other things, that the defendant doctors committed fraud because their medical practices were fraudulently incorporated and illegally operated or controlled by non-physicians. *Mallela*, 372 F.3d at 502. The Second Circuit found that the "issue posed is clearly recurring, and appears to be one of great importance to the State of New York," because "[a]nswering it will require consideration of the important policy

considerations that gave rise to the no-fault scheme itself." *Id.* at 507. As such, the Second

Circuit certified the question to the New York Court of Appeals of whether violations of the

above-described provisions permit insurance carriers to "withhold payment for medical services

provided by fraudulently incorporated enterprises to which patients have assigned their claims."

4 N.Y.3d 313, 319 (2005).

The New York Court of Appeals accepted certification and answered in the affirmative—

that insurance companies may withhold payment for medical services provided by fraudulently

incorporated enterprises. *Id.* In doing so, the Court of Appeals made clear that the insurance

companies did not allege that the services provided by the medical providers were unnecessary

or improper. *Id.* Instead, the insurance companies alleged that:

> [U]nlicensed defendants paid physicians to use their names on paperwork filed with
> the State to establish medical service corporations. Once the medical service
> corporations were established under the facially valid cover of the nominal
> physician-owners, the nonphysicians actually operated the companies. To maintain
> the appearance that the physicians owned the entities, the nonphysicians caused the
> corporations to hire management companies (owned by the nonphysicians), which
> billed the medical corporations inflated rates for routine services.

*Id.* at 319-20. As a result, "the actual profits did not go to the nominal owners but were

channeled to the nonphysicians who owned the management companies." *Id.*

In response to the certified question, the Court of Appeals held in *Mallela* that insurance

companies were entitled to deny reimbursement because "the defendant companies undisputedly

fail[ed] to meet the applicable state licensing requirements, which prohibit nonphysicians from

owning or controlling medical service corporations." *Id.* at 320-21. As the *Mallela* Court

reasoned, the No-Fault Insurance regime, Insurance Law § 5102 *et seq.*, "requires no-fault

carriers to reimburse patients (or, as in this case, their medical provider assignees) for 'basic

economic loss.'" *Id.* at 320. "Interpreting the statute, the Superintendent of Insurance

promulgated 11 NYCRR 65-3.16 (a) (12) (effective April 4, 2002) and excluded from the meaning of 'basic economic loss' payments made to unlicensed or fraudulently licensed providers, thus rendering them ineligible for reimbursement." *Id.* As such, fraudulently incorporated clinics may not receive reimbursement under the plain terms of the statute. *See id.* This rule is designed "to combat rapidly growing incidences of fraud in the no-fault regime, fraud that [the Superintendent] has identified as correlative with the corporate practice of medicine by nonphysicians." *Id.* at 323 n.2. Accordingly, "carriers may look beyond the face of licensing documents to identify willful and material failure to abide by state and local law." *Id.* at 321.[4]

The Court of Appeals' decision in *Mallela* has been settled law for nearly 20 years. Indeed, insurance companies have since filed numerous federal wire fraud, mail fraud, and healthcare fraud charges against clinics using the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See, e.g. Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 295 (E.D.N.Y. 2013) ("*Mallela* stands for the proposition that an insurer may bring an action for fraud or unjust enrichment, based on fraudulent incorporation, to recover payments made to fraudulently incorporated providers"); *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 276 (E.D.N.Y. 2012) (holding same); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d

---

[4] Thus, the New York Court of Appeals has made clear that the key question under *Mallela* is whether non-physicians are the "de facto owners of or exercised substantial control" over a medical practice. *See Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 406 (2019). Further, there is no requirement that non-physicians exercise *complete* control over clinics—only that they exercise *substantial* control. This rule reflects the "need to ensure that providers of professional services are not unduly influenced by unlicensed third parties who are free of professional responsibility requirements and may disregard patient care in operating a 'corporation . . . organized simply to make money.'" *Id.* at 404. The rule further is violated, for example, where the alleged owners of clinics engage in "funneling of profits to nonphysicians who owned companies that billed the professional corporation inflated rates." *Id.* at 406.

358, 369 (E.D.N.Y. 2012) (holding same); *Gov't Emps. Ins. Co. v. Ajudua*, No. 15-CV-5199

(MKB), 2018 WL 7252961, at *6 (E.D.N.Y. Dec. 18, 2018), *report and recommendation*

*adopted sub nom. Gov't Emps. Ins. Co. v. Lurie*, No. 15CV05199MKBRLM, 2019 WL 276201

(E.D.N.Y. Jan. 22, 2019) (holding same).

 Courts have further relied on *Mallela*'s reasoning in multiple cases involving criminal

wire fraud, mail fraud, and healthcare fraud charges. For instance, Judge Oetken applied the

*Mallela* principles in *Zemlyansky*, a 2013 Southern District of New York criminal case in which

multiple defendant doctors were charged with fraudulent incorporation, where they incorporated

a medical clinic and saw patients but were paid a flat percentage or salary by the non-physicians,

and were instructed to follow set treatment protocols.  *See United States v. Zemlyansky*, 945 F.

Supp. 2d 438, 447 (S.D.N.Y. 2013).  The defendants sought to dismiss the wire fraud charges

against them because, in their view, the insurer suffered no injury. *Id.* at 448. In particular, the

defendants asserted that "the insurer has an underlying obligation—unrelieved by Regulation

65–3.16(a)(12) or any other provision of New York Law—to make direct payment to the insured

for treatment rendered by a licensed professional. When a patient assigns his or her claim to a

fraudulently incorporated PC, Defendants argue, the PC's ineligibility to receive payment (by

virtue of the regulation) results in a 'windfall' to the insurer, and '[w]indfalls are not injuries.'"

*Id.* at 448.  Judge Oetken denied the motion and found that this "argument lacks merit, most

importantly because it fails to account adequately for the New York Court of Appeals' 2005

decision in *Mallela*." *Id.* As Judge Oetken noted, "the Court of Appeals definitively held that, as

a matter of New York law, fraudulently incorporated PCs 'are not entitled to reimbursement' by

insurers." *Id.* (citing 4 N.Y.3d at 320). Accordingly, "irrespective of whether a *patient* would be

entitled to reimbursement if he had *not* assigned his claim to a PC, it is clear (and has been clear

since 2005) that where such an assignment has occurred, and where the PC is not owned by a licensed professional, an insurer has a *right* to refuse payment on the claim." *Id.* Judge Oetken further noted that the "fact that *Mallela* was a civil case is simply beside the point, as New York law, as construed by the New York Court of Appeals in *Mallela,* does not create the substantive federal offenses at issue." *Id.* "Rather, the Court here looks to New York law simply to determine whether a material misrepresentation has been made and whether it was made with the intent to defraud." *Id.* "On those issues, *Mallela* is crystal clear." *Id.*

Following Judge Oetken's decision on the *Zemlyansky* motion to dismiss, he conducted a two-week trial, after which physician Tatyana Gabinskaya and co-conspirator non-physicians, including Mikhail Zemlyansky, were convicted of health care and wire fraud charges. *See United States v. Gabinskaya,* 829 F.3d 127, 130 (2d Cir. 2016). Dr. Gabinskaya appealed her conviction on various grounds including insufficiency of evidence, and improper jury instructions, but her conviction was fully upheld on appeal. *Id.* In reviewing Dr. Gabinskaya's conviction, the Second Circuit expressly reaffirmed the New York Court of Appeals' *Mallela* principles set forth above, and rejected the very arguments that the Moving Defendants make here.

For example, it was alleged that Dr. Gabinskaya had signed incorporation paperwork forming the medical practice Clearview PC, and signed documents to open its bank accounts. *Gabinskaya,* 829 F.3d at 131. In actual fact, however, the evidence showed that Gabinskaya was merely a front whose medical license permitted Clearview to submit insurance claims. *Id.* The Second Circuit noted that it was Zemlyansky and Danilovich – who were not physicians – who controlled and operated the clinic, with no actual oversight by Gabinskaya, in such a way as to maximize the insurance payout from the statutory pool of no-fault automobile insurance. *Id.*

16

The jury also heard that Dr. Gabinskaya had been required by Allstate Insurance to submit EUOs regarding insurance claims which had been submitted by Clearview PC.  *Id.*  During the EUO, Gabinskaya lied that she had worked at Clearview "three hours per day," "two, three times a week" during which times she approved days off and conducted a "five, ten minute interview" of all new patients "to determine which MRI comes first."  *Id.*  The Second Circuit noted that this testimony was flatly contradicted by the testimony set forth by at least three Clearview employees and at least one clinic patient.  *Id.*

### C.  Relevant Facts

As stated, Gulkarov and Israilov recruited over half a dozen medical practitioners – including medical doctors, chiropractors, and acupuncturists – to open and participate in the No-Fault Clinics between in or about 2014 up to and including in or about 2021. *Gulkarov* Indictment ¶ 14.  While purporting to be legitimate medical care clinics specializing in treating patients, the No-Fault Clinics were never owned, operated, or controlled by licensed medical practitioners.  *Id.*  Instead, the Clinic Controllers were the actual owners, operators, and controllers of the Clinics.  *Id.*  In this type of fraudulent incorporation scenario – which is sometimes colloquially referred to as a "doc-in-the-box" scheme – the non-physicians establish the medical clinic, and then recruit pliable doctors that are willing to trade their medical integrity in exchange for the promise of consistent patient referrals and a steady paycheck.

Here, the Indictment alleges that the No-Fault Physicians were recruited by the Clinic Controllers, including Gulkarov and Israilov, who installed them in medical Clinics that the Clinic Controllers owned or established.  The Clinic Controllers then oversaw all aspects of the Clinics, including hiring, firing, and finances, staffing the Clinics with nearly a dozen licensed medical practitioners including doctors, acupuncturists, and chiropractors.  ¶ 9.  These medical

professionals then ceded their medical judgment and the control of their medical practices to the

Clinic Controllers, by engaging in unnecessary and excessive medical treatments, among other

things. *Id.*

For example, co-defendant Rolando Chumaceiro, a/k/a "Chuma," is a licensed medical

doctor who incorporated the medical clinic, Smart Choice Medical PC, as part of this scheme.

*Id.* Similarly, co-defendant Marcelo Quiroga is a licensed chiropractor who incorporated two

chiropractic corporations, Southern Boulevard Chiropractic PC and Comfort Choice Chiropractic

PC, as part of the scheme. *Id.* Defendants Chumaceiro and Quiroga both, at the direction of

Gulkarov and Israilov, prescribed unnecessary and excessive medical treatments and overbilled

insurance companies under the No-Fault Law. *Id.*

The influence of the leaders of the scheme, such as Gulkarov and Israilov, on the captive

No-Fault Physicians is apparent when considering the Government's allegations regarding the

uniform practices and procedures of the No-Fault Clinics. When a patient arrived for treatment

at the No-Fault Clinics, the patient was typically evaluated by a No-Fault Physician, who

recommended an almost identical schedule of treatments for every patient. ¶ 17. This schedule

of treatments included physical therapy, chiropractory, and acupuncture. *Id.* Nearly every time a

patient went to a No-Fault Clinic, the patient received all three of these treatments. *Id.* In

addition, the No-Fault Physicians prescribed prescription drugs that were medically unnecessary

given the degree of the Patients' injuries; durable medical equipment ("DME") that was not

tailored to the Patients' injuries; and medical resonance imaging ("MRIs") for areas of the body

that lacked a clinical indication of injury. *Id.* The No-Fault Physicians further prescribed painful

and unnecessary electrodiagnostic testing including electromyography ("EMG"s) and nerve

conduction velocity ("NCV") testing. *Id.* In legitimate medical practices, physicians use EMG

and NCV testing to detect neuromuscular abnormalities and nerve damage by inserting needles into the arms and legs to measure electrical activity. *Id.* The No-Fault Physicians, however, abused the procedures by routinely prescribing EMG and NCV testing to patients who lacked clinical indications of neuromuscular injuries. *Id.*

These disturbing allegations highlight precisely the rationale and wisdom of New York State's strict mandate that only licensed physicians may control a medical facility.

### D.  Discussion

**1.  The Moving Defendants' Challenge to the *Mallela* Fraudulent Incorporation Theory in Count One Ignores Binding New York and Second Circuit Precedent**

The Moving Defendants cite a series of fraud cases for the proposition that in order to establish the intent to injure element of fraud, "it is necessary to identify the core economic exchange between the parties." Gulkarov Mot. at 13. The Moving Defendants then go on to conclude that the core economic exchange in the Government's health care fraud charge in Count One is lacking, because New York's requirement that only physicians may own and control medical clinics is not "essential" to the bargain between the insurer and the insured. *Id.* at 17.

The Moving Defendants misunderstand how the New York No-Fault regime functions. No-Fault benefits are not a creature of private contract. Instead, they are a state-imposed statutory regime "supplanting the state's common law tort remedies for most injuries associated with automobile accidents with a no-fault insurance scheme." *Mallela*, 372 F.3d at 502. As part of this regime, injured parties may only "recover benefits from insurers for 'basic economic loss,' including medical expenses, that arise out of the use or operation of a covered motor vehicle." *Id.* (citing N.Y. Ins. Law § 5102). The regime further permits the Superintendent of

Insurance to pass regulations implementing the law.  *Id.*  In 2002, the Superintendent of Insurance promulgated 11 NYCRR 65–3.16(a) (12) and "excluded from the meaning of 'basic economic loss' payments made to unlicensed or fraudulently licensed providers, thus rendering them ineligible for reimbursement." *Mallela*, 4 N.Y.3d at 320. As such, New York state created a right (No-Fault benefits for "basic economic loss") and legally limited the scope of that right (by defining the scope of "basic economic loss").  This is the state's prerogative.  As the *Mallela* Court held, "[w]here, as here, the Superintendent has properly crafted a rule within the scope of his authority, that rule has the force of law and represents the policy choice of this State." *Id.* at 321. Accordingly, the "Superintendent's regulation allowing carriers to withhold reimbursement from fraudulently licensed medical corporations governs this case." *Id.*

The Moving Defendants respond by asserting *ipse dixit* that "New York State regulation making a layperson-owned medical corporation ineligible for payment of claims—even for legitimate and necessary treatments—is not part of the contract between the insurer and the insured individuals," but rather "exists independent of the agreement between the insurer and the insured." *See* Gulkarov Mot. at 14.  The Moving Defendants tellingly fail to discuss why this is the case (or mention *Mallela* or the history of the No-Fault regime).  The Moving Defendants also tellingly fail to describe the purported "contract" between the insurer and the insured that allegedly creates and defines insureds' No-Fault benefits.  The reason for this is that there is no such "contract."  No-Fault benefits are created by statute.  When an insured goes to a medical provider, the insured signs an assignment of benefit form (known as an "NF-3") transferring his or her *statutory* rights to the provider.  The NF-3 form accordingly states in relevant part in capitalized, bolded letters, "**I HEREBY ASSIGN TO THE HEALTH CARE PROVIDER INDICATED BELOW ALL RIGHTS, PRIVILEGES AND REMEDIES TO PAYMENT**

**FOR HEALTH CARE SERVICES PROVIDED BY THE ASSIGNEE <u>TO WHICH I AM</u>
<u>ENTITLED UNDER ARTICLE 51 (THE NO-FAULT STATUTE) OF THE INSURANCE</u>
<u>LAW</u>** (emphasis added)." An example NF-3 form is incorporated herein as <u>Exhibit A</u>.
Accordingly, the entire basis of the Moving Defendants' theory—that No-Fault benefits are
created and defined solely by contract—is mistaken.

The Moving Defendants' remaining arguments consist largely of strawman attacks on
Judge Oetken's opinion in *Zemlyanksy* and the Second Circuit's decision in *Gabinskaya*—where
this Circuit clearly held that *Mallela* authorizes federal criminal fraud charges based on false
representations of physician ownership. With regard to *Zemlyansky*, the Moving Defendants
claim that Judge Oetken "did not perform an analysis of the core economic bargain between the
contracting parties required by the Second Circuit in order to determine whether the false
statement concerning ownership goes to the 'nature of the bargain itself' between the parties."
Gulkarov Mot. at 17. This position is meritless. The *Zemlyansky* defendants made the same
argument relying on the same case law as the Moving Defendants—namely, that "the
Government's *Mallela* theory fails because the fraudulent inducement of a party to enter into a
contract does not constitute criminal fraud" where "the bargained for services were properly
provided; wherein there was no misrepresentation as to the nature or quality of the services
provided; and the insurance companies were not injured through any alleged irrelevant deception
as to who actually owned and controlled the medical P.C.s." *See* Memorandum of Law in
Support of the Defendant Boris Treysler's Pretrial Motions, *United States v. Zemlyansky et al.*,
Defendants, Boris Treysler, Moving Defendant., 2013 WL 8366074 (S.D.N.Y.). In rejecting that
argument, Judge Oetken properly found that "the Court of Appeals definitively held that, as a
matter of New York law, fraudulently incorporated PCs 'are not entitled to reimbursement' by

21

insurers." *Zemlyansky*, 945 F. Supp. 2d at 448 (quoting *Mallela*, 4 N.Y.3d at 320).  The

"insurer's entitlement to withhold reimbursement in these circumstances is an interest in money

or property, the deprivation of which can be an injury under the fraud statutes." *Id.* at 448-49.[5]

The Moving Defendants give equally short shrift to the Second Circuit's affirmance of

*Zemlyansky* in *Gabinskaya*.  The Moving Defendants asserts only that *Gabinskaya* is irrelevant

because, in their view, the "defendant [there] did not raise the question as to whether false

representations about ownership were essential to the bargain between the insurer and insured,

and therefore sufficient to establish the scheme to defraud element of the federal fraud statutes at

issue."  Gulkarov Mot. at 15.  This is incorrect.

*Gabinskaya* plainly set forth the controlling case law that applies the New York Court of

Appeal's *Mallela* principles of fraudulent incorporation into federal criminal fraud trials such as

this one.  Indeed, Dr. Gabinskaya challenged her conviction on *two* separate bases, thereby

providing the Court with multiple opportunities to determine whether *Mallela*-style fraudulent

incorporation allegations may form the basis of an essential element of a federal health care or

---

[5] The Moving Defendants have not addressed *Mallela* in their briefing. However, the Court can easily reject any argument on reply that the New York Court of Appeals in *Mallela* somehow failed to consider their so-called analysis of the "core economic bargain." The New York Court of Appeals squarely addressed this issue because, as the Court of Appeals noted, "State Farm never alleged that the actual care received by patients was unnecessary or improper." 4 N.Y.3d at 320.  Instead, the "patients insured by State Farm presumably received appropriate care from a health professional qualified to give that care," and State Farm's complaint centered "on fraud in the corporate form rather than on the quality of care provided." *Id.*  In their briefing, the *Mallela* defendants repeatedly asserted that they should still receive payment under principles of contract law. *See* Brief of Certain Defendants-Appellees, *State Farm Mut. Auto. Ins. Co. v. Robert Mallela*, 2003 WL 24174349 (C.A.2), 47-48 ("Even assuming that these allegations were false, there is no damage to State Farm since their insureds received quality medical treatment from licensed professionals. As such, equity and good conscience could not allow State Farm to avoid its contractual obligation to its insureds to pay on these claims."). The New York Court of Appeals nonetheless rejected these arguments for the reasons stated above.

wire fraud charge.  In response to both points, the *Gabinskaya* court answered that question in the affirmative.

For example, with regard to Dr. Gabinskaya's challenge to the sufficiency of the evidence, the Second Circuit stated that:

> Gabinskaya does not argue that any of the individual factors the jury was instructed to consider, such as responsibility for the financial risk of the PC and domination and control over the PC, as well as various indicia of formal ownership, were improper, nor that any different or additional factors should have been included. . . Gabinskaya's argument is that the jury's consideration should have been limited solely to formal indicia of ownership. We reject that argument, and hold that, as in the civil context, a factfinder in a criminal case concerning no-fault insurance fraud in New York may consider factors beyond formal ownership in the context of fraudulent incorporation of a PC, which serves the State's interests both in preventing fraud and in preventing nonphysicians from practicing medicine.

*Gabinskaya,* 829 F.3d at 134.  Thus, the Second Circuit explicitly rejected the Moving Defendants' contention that the *Mallela* rules apply only to civil cases.  *Cf.* Gulkarov Mot. at 14-15 ("That insurers incidentally benefit from this prohibition, by gaining the right through civil litigation to withhold payment from, or recover payments made to layperson owned medical corporations, does not make that prohibition part of the economic exchange between the insurer and the insured, in whose shoes the assignee medical corporation stands.").

Moreover, in upholding Dr. Gabinskaya's conviction on sufficiency grounds, the Second Circuit also implicitly endorsed the notion that the *Mallela* principle of fraudulent incorporation can form the basis for a federal health care fraud or wire fraud conviction.  Here, the Court specifically noted that:

> The jury was entitled to conclude from Gabinskaya's false testimony during the EUO, along with the totality of the evidence, that Gabinskaya understood that, in order for Clearview lawfully to submit no-fault insurance claims, she, as a licensed physician, had to be not merely its paper owner but rather its actual owner, and that she knowingly participated in the fraudulent scheme with the intent to further its aims by misrepresenting her role at Clearview. Gabinskaya's challenge to the sufficiency of the evidence therefore fails.

*Gabinskaya*, 829 F.3d at 132.  These findings, standing alone, close the door on any argument that a fraudulent incorporation theory cannot form the basis of a federal health care fraud charge.

But the *Gabinskaya* court went further, also considering the New York Court of Appeals *Mallela* fraudulent incorporation theory in the context of Dr. Gabinskaya's challenge to the jury instructions issued by Judge Oetken.  There, Gabinskaya argued that the jury was improperly instructed on the definition of "ownership" in connection with the no-fault insurance system, alleging that "ownership" should have been defined "purely formally," without regard to the type of evidence that the Government will seek to introduce in this case regarding the Clinic Controllers' domination and control of the No-Fault Clinics.  *See id*.  In response, the Second Circuit again reiterated its fidelity to the New York Court of Appeals' *Mallela* principles, holding that:

> In order to be entitled to receive reimbursement from a no-fault insurer, a medical services PC must be owned by a licensed physician. *See* N.Y. Bus. Corp. Law § 1507(a); N.Y. Comp. Codes R. & Regs. tit. 11, § 65–3.16(a)(12). Under New York law, *such ownership has been authoritatively held to mean more than merely formal ownership of stock certificates*.

*Id.* at 133 (emphasis added).  Based on the foregoing, it is clear that the New York Court of Appeals and Second Circuit's decisions in *Mallela* and *Gabinskaya,* are binding precedent, and further, these cases leave no doubt that an individual can in fact be charged in a federal criminal fraud Indictment on the theory that that person participated in a conspiracy to fraudulently incorporate, or operate, a medical clinic.

### 2.   The Moving Defendants Cite No Cases on Point

None of the other cases that the Moving Defendants advance in support of their arguments are on point.  Indeed, because all of the *Mallela*-related federal precedent favors the Government's theory of Indictment, the Moving Defendants are unable to cite to a single case

that has anything to do with New York's No-Fault automobile insurance regime.  *See e..g.,* Gulkarov Mot. at 13 (*Citing Regent Office Supply* ("money for stationary"); *Starr* ("money for mailing services"); *Davis* ("money for construction of steel decking"); *Paccione* ("money for proper disposal of medical waste"); *Frank* ("money for proper disposal of sewage"); *Shellef* ("money for an industrial solvent"); and *Novak* ("money for ability to hire non-Union labor, as per CBA").

Moreover, as they acknowledge, some of the cases that the Moving Defendants analyze actually support the Government's arguments.  *See e.g.,* Gulkarov Mot. at 11-12 (*citing United States v. Paccione* – court found requisite fraudulent intent with regard to specially licensed disposers of medical waste; *United States v. Frank* – court found requisite fraudulent intent with respect to offshore disposal of raw sewage; *United States v. Walker* – court found requisite fraudulent intent with regard to immigration lawyer's substantial fees for asylum applications).

No Court has accepted the Moving Defendants' theory that the *Mallela* fraudulent incorporation theory cannot form the basis for federal criminal charges, and this Court should not accept the defendant's invitation to be the first.  To hold otherwise would have serious societal consequences.  Accepting the Moving Defendants' theory would mean that violations of state and federal licensing requirements concerning the practice of medicine would not be criminal. This would severely impact the state's ability to regulate the practice of medicine. *See, e.g.*, *Gov't Emps. Ins. Co. v. Avanguard Med. Grp., PLLC*, 27 N.Y.3d 22, 29–30 (2016) ("[H]ospitals and ASCs [ambulatory surgical centers] are regulated under Public Health Law article 28, and are subject to strict standards under the Public Health Law and State Department of Health Regulations that cover, inter alia, facility licensing and maintenance (*see* 10 NYCRR part 446 [detailing the extensive reporting requirements], 10 NYCRR 400.3 [requiring

all hospitals and ASCs to maintain and, if required, reproduce any medical report or record] )."). It would also impact the federal government's ability to police fraud in the practice of medicine in connection with Medicare. *See, e.g., Fischer v. United States*, 529 U.S. 667, 672 (2000) ("Providers of health care services, such as the two hospitals operated by WVHA, qualify to participate in the program upon satisfying a comprehensive series of statutory and regulatory requirements, including particular accreditation standards. Hospitals, for instance, must satisfy licensing standards, 42 CFR § 482.11 (1999); possess a governing body to "ensure that there is an effective, hospital-wide quality assurance program to evaluate the provision of patient care," § 482.21; and employ a "well organized" medical staff accountable on matters relating to "the quality of the medical care provided to patients," § 482.22(b).").

Lastly, even if the Moving Defendants' theory regarding fraudulent incorporation were correct—and it is not—the defendants' false statements about ownership and control are still material because those lies were capable of influencing insurance companies' investigations into unnecessary medical procedures being conducted at the Clinics. *See United States v. Johnson*, 945 F.3d 606, 614 (2d Cir. 2019) ("A misrepresentation is material if it is capable 'of influencing the intended victim.'" (quoting *Neder v. United States*, 527 U.S. 1, 24 (1999)). The New York Court of Appeals recognized in *Mallela* that the prohibition on non-physician ownership exists "to combat rapidly growing incidences of fraud in the no-fault regime, fraud that [the Superintendent of Insurance of the State of New York] has identified as correlative with the corporate practice of medicine by nonphysicians." 4 N.Y.3d at 323 n.2. The Moving Defendants, in turn, are charged with causing unnecessary medical treatments to be conducted on patients. *See Gulkarov* Indictment ¶¶ 16-18. As such, the Moving Defendants' lies to insurance companies were capable of influencing the companies' investigations into the unnecessary

medical treatments being conducted by the Clinics by concealing a key flag of fraud—namely, non-physician ownership. The false statements are accordingly material irrespective of whether non-physician ownership is an independent basis for non-payment of insurance claims.[6]

In sum, this Court should follow the Second Circuit's prior precedents in *Mallela* and *Gabinskaya,* and reject the Moving Defendants' motion to partially dismiss Count One of the Indictment.

## II.    The Court Should Deny the Moving Defendants' Motion to Suppress Recordings of Calls on Which They Were Intercepted During the Khaimov Wire and All Evidence Derived from the Intercepted Calls

The Moving Defendants next seek to suppress recordings of all calls on which they were intercepted during a wiretap of Peter Khaimov from February 2017 to March 2017 (the "Khaimov Wire"), and all evidence derived from these intercepted calls. Israilov Mot. at 9. In support of that application, Israilov and Gulkarov argue that law enforcement failed to demonstrate that normal investigative procedures would have been unsuccessful or unlikely to succeed (commonly known as the "necessity" requirement). *Id.* The Court by now is familiar with this line of argument. In *United States v. Rose et al.*, 19 Cr. 789, defendant Leon Blue sought to suppress wiretaps of Anthony Rose (the "Rose Wire") on the same theory. *See United States v. Rose*, No. 19 CR. 789 (PGG), 2021 WL 2117119, at *4 (S.D.N.Y. May 24, 2021) (the

---

[6] These statements are also admissible as proof of the conspiracy, because they demonstrate that there was a meeting of the minds between the defendants about what lies should be told in response to the inquiring insurance companies. Indeed, the *Gabinskaya* court considered this precise issue on appeal, when Dr. Gabinskaya claimed that the evidence at trial was insufficient to prove that she had knowledge of the no-fault scheme. In rejecting this argument, the Second Circuit held that Dr. Gabinskaya did indeed have such knowledge, based on, among other things, the lies she had told in the EUOs regarding clinic ownership. *See Gabinskaya*, at 132 ("Gabinskaya's perjurious statements were all designed to [falsely] portray Gabinskaya as involved in or controlling Clearview's operations, as is necessary under New York State law.").

"*Rose* Opinion"). The Court disposed of Blue's challenge, and the latest iteration fares no better.[7]

### A. Relevant Facts

#### 1. Background of the Investigation

The majority of the relevant facts are set forth in the *Rose* Opinion. *Rose*, 2021 WL 2117119, at *2–4. The investigation of the Defendants' fraudulent scheme was initially pursued by the Westchester County District Attorney's Office (the "D.A.") and the New York State Police. The investigation began in 2013 with a focus on staged accidents. The target of the initial wiretap application in June 2016 was Robert Garris, who allegedly was recruiting "victims" and steering them to a particular medical clinic located at 2 Wilson Place in Mount Vernon, New York. The clinic – which was operated by Defendant Nathaniel Coles – paid kickbacks for the referrals. (June 21, 2016 Utzig Aff., ¶¶ 2, 33-268).

Prior to seeking the wiretap on Garris, the D.A. and State Police had used a number of traditional investigative techniques, including undercover officers, confidential informants, and analysis of telephone records. These techniques had not proven adequate to identify all of the individuals involved in the scheme and to collect the evidence necessary to prosecute them. (June 21, 2016 Cecchini Aff., ¶¶ 11-12).

The initial wiretap was authorized by Justice Warhit of the New York Supreme Court. (July 21, 2016 Cecchini Aff. ¶ 4). In July 2016, Justice Warhit authorized an extension of the Garris wiretap and a new wiretap on Coles's phone based on affidavits demonstrating both that

---

[7] The Government notes that defendant Khaimov has not sought to suppress his communications on the Khaimov Wire. As such, any challenge on his behalf has been forfeited. *See, e.g.*, *United States v. Donziger*, No. 11-CV-691 (LAK), 2021 WL 3726913, at *5 (S.D.N.Y. Aug. 23, 2021).

Garris and Coles were using the subject telephones to engage in insurance fraud and that traditional investigative techniques – while still being utilized by investigators – remained inadequate to discover the full scope of the criminal activity and to identify all of those participating in it. (July 21, 2016 Utzig Aff., ¶¶ 22-25, 40, 46, 53-54, 66, 74, 94, 97-98, 111-128; July 21, 2016 Huseby Aff., ¶¶ 10-40; Aug. 17, 2016 Utzig Aff., ¶ 6).

Interception of Defendant Coles's communications revealed that he was a small part of a much larger network.  In August 2016, Justice Warhit authorized the continued interception of communications over the Garris and Cole phones.  He did so based on an affidavit indicating, *inter alia*, that Coles's text messages indicated that he was bribing first responders and medical personnel to disclose information about car accident victims.  (Aug. 17, 2016 Utzig Aff., ¶¶ 56-57).  Coles forwarded the information that he obtained to a telephone registered to the "Law Office of Lee A. Fine."  (*Id.* at ¶ 58).  The D.A. was not able to identify the user of this phone. Wiretap evidence obtained later revealed that lead defendant Anthony Rose used that phone. (Sept. 16, 2016 Schneeloch Aff., ¶¶ 83-109; Oct. 14, 2016 Schneeloch Aff., ¶ 8).

The affidavit submitted in support of the August 18, 2016 wiretap application recounts the investigators' continued use of traditional investigative techniques, and the inadequacy of these traditional techniques to reveal all of the participants in the criminal activity, including the "victims" and the corrupt medical staff and attorneys.  (Aug. 18, 2016 Huseby Aff., ¶¶ 11-47). On September 16, 2016, the D.A. obtained a wiretap on what investigators later learned was Anthony Rose's phone (the "Rose Phone").  (Oct. 14, 2016 Cecchini Aff., ¶ 7).  In the month preceding September 2016, interceptions of communications over Coles's phone indicated that he consistently sent names and telephone numbers of car accident victims to the user of the Rose Phone. The user of the Rose Phone identified himself as "Todd Chambers," and it was

"Chambers" who arranged for medical clinics and lawyers to pay Coles for patient referrals. Despite extensive investigation, including surveillance, investigators were not able to determine whether the user of the Rose Phone was Anthony Rose, his son Anthony Rose, Jr., or someone else.  (Sept. 16, 2016 Schneeloch Aff., ¶¶ 83-109).

In the September 16, 2016 wiretap application, the D.A. explained at length the numerous, traditional investigative techniques that had been used, and why those techniques had proven insufficient to disclose all the details of the criminal enterprise, including all of its participants and the flow of the illegal proceeds of the scheme.  (Sept. 16, 2016 Cecchini Aff., ¶¶ 11-55).

On October 14, 2016, the D.A. sought an extension of the wiretap on the Rose Phone.  In the affidavit filed in support of the application, investigators reported on what the prior month's interceptions had revealed, including that dozens of individuals were improperly providing confidential information to the conspirators, and that the conspirators were using a call center staffed with at least fifteen employees to steer accident victims to corrupt clinics and attorneys. The affidavit explained that call center employees used fictitious names and assigned code names to those providing confidential information, making it difficult to identify the corrupt medical staff and first responders.  (Oct. 14, 2016 Schneeloch Aff., ¶¶ 20, 39-63).

The application for the October 14, 2016 extension included seventeen pages that addressed the traditional investigative techniques that had been used or considered to date, including video surveillance, physical surveillance, GPS devices, phone record analysis, confidential informants and undercover officers, arrests, and search warrants.  Investigators separately addressed each investigative technique and explained why that technique was either

impractical or inadequate to identify the scope, organization, and makeup of the criminal enterprise.  (Oct. 14, 2016 Cecchini Aff., ¶¶ 17-60).

On November 10, 2016, investigators sought an extension of the wiretap on the Rose Phone.  In the State Police affidavit supporting the extension application, investigators explained that the intercepted conversations revealed that Anthony Rose was receiving kickbacks from seventy-five medical clinics and twenty-five lawyers, and was seeking to expand his network of corrupt sources, clinics, and lawyers into New Jersey.  (Nov. 10, 2016 Schneeloch Aff., ¶¶ 55-56, 58, 66, 81, 98, 106).

The D.A.'s affidavit for the November 10, 2016 extension request contained a similar nineteen-page discussion of the alternative investigative techniques that had been found wanting or were otherwise impractical.  The D.A. once again separately considered each investigative technique and the challenges associated with its use, and explained why these traditional techniques would not reveal the full extent of the criminal enterprise.  (Nov. 10, 2016 Cecchini Aff., ¶¶ 20-68).

Investigators obtained monthly extensions of the wiretap on the Rose Phone through March 2017. Each extension application was accompanied by affidavits that similarly addressed recent developments in the investigation and why traditional investigative techniques were not adequate to reveal the full scope of the criminal enterprise and all of its participants. (Dec. 8, 2016 Schneeloch Aff.; Jan. 6, 2017 Schneeloch Aff.; Feb. 3, 2017 Schneeloch Aff.; Mar. 2, 2017 Schneeloch Aff.; Nov. 10, 2016 Cecchini Aff.; Dec. 8, 2016 Cecchini Aff.; Jan. 6, 2017 Cecchini Aff.; Feb. 3, 2017 Cecchini Aff.; Mar. 2, 2017 Cecchini Aff.).

### 2.    The Khaimov Wire

In February 2017, the D.A. applied for the first time for a wiretap on a phone used by Defendant Peter Khaimov (the "Khaimov Wire"). As with every application preceding it, the February 2017 application set forth at length the rationale for the wiretap and why traditional investigative techniques were still ineffective.

First, as set forth in the affidavit of investigator Paul Schneeloch (the "Feb. 3 2017 Schneeloch Aff."), Khaimov appeared to be a manager of one of the no-fault clinics in the New York City area involved in the bribery and healthcare fraud under investigation. (Feb. 3 2017 Schneeloch Aff. ¶¶ 103-118). Indeed, Rose spoke with Khaimov over the Rose Wire repeatedly about the scheme. (*Id.* at ¶¶ 119-126). Second, as set forth in the 70-page, 154-paragraph affidavit of Craig Ceccini (the "Feb. 3 2017 Cecchini Aff."), investigators went through nine separate traditional investigative techniques and explained why each—without the additional use of a wiretap on Khaimov's phone—was incapable of accomplishing the goals of the investigation: namely, to identify the "office managers," "medical personnel," "attorneys," and "agents" who "participate[d] in these schemes to defraud." (Feb. 3 2017 Cecchini Aff. ¶ 27). This analysis included, among other things, a discussion of the following investigative techniques:

- Video Surveillance: At the "management level" of the organization, a "reliance upon video recordings are not an option, as all of them appear to predominantly work behind the scenes in private offices where the public is not allowed." (*Id.* ¶ 39). In addition, meetings "have been set on several occasions, but most if not all of these meetings have occurred either inside a building, or inside a vehicle." (*Id.* at fn. 11; *see generally id.* at ¶¶ 39-42).

- Physical Surveillance: "a large portion of 'victims' referred to the clinics are from so called non-staged accidents," after which "one of Rose's employees[] then calls these victims and if one is signed up, ultimately refers him or her to a clinic, with an accompanying call to Coles or another clinic in the network. Thus, a large portion of these designated crimes are committed through the use of the telephone, and surveillance, in any manner, will not allow this investigation to proceed past this initial stage." (*Id.* at ¶ 48; *see generally id.* at ¶¶ 43-49).

- Global Positioning Devices (GPS): "While [GPS] will allow us to relax our surveillance on Garris, Coles or any other member of the enterprise . . . they are accurate to only one-half mile and can only be updated every fifteen minutes," and "will not allow us to determine the reason for this meeting, nor afford us the ability to know the contents of any communications relating to the reason for such meeting . . . ." (*Id.* at ¶ 50; *see generally id.* at ¶¶ 50-55).

- Analysis of Telephone Records: the "analysis of telephone records for the above-captioned cellular telephones will not provide us with the full extent of this criminal enterprise. In particular, it will not afford us the opportunity to intercept communications in which references to additional acts in support of the enterprise as well as discussions regarding the distribution of the proceeds of these crimes occur. While these analysis [sic] will reveal other telephones possibly used in order to further the designated crimes, we will not know for sure without the content of those communications, nor will [we] be able to determine the users of these telephones." (*Id.* at ¶ 60; *see generally id.* at ¶¶ 56-63).

- Confidential Information (CI) and Source of Information (SOI): "On or about December 23, 2016, Dr. Andre Duhamel signed up as a cooperator with the New York State Police. As of the date of this application, he is working one day per week at a clinic run by Gikor Sonayan a/k/a George. Additionally, he has been in contact with Peter Khaimov, an individual who referred him to Coles' clinic initially, regarding the return of a check book and bank card for a bank account he opened for Coles shortly before being fired. Finally, Duhamel has also been in contact with individuals referred to as George Celify and Erick St. Louis, who both appear to work for an individual named Alex in order to establish a bank account for a medical clinic that they also plan to operate . . . . The fact that Duhamel has the ability to communicate with Khaimov and Alex Gulkarov, while helpful, does not have the potential to generate a significant amount of evidence against others, especially Rose and his out of state networks. This is especially true in light of the fact that Khaimov has recently refused to meet with Duhamel. While important and perhaps exposing portions of the fraudulent schemes, other matters such as any agreements related to the referral and assignments of patients between clinic managers and attorneys, the identity of the owners, and any money laundering schemes between these actors in order to distribute the proceeds of these crimes may not become known solely through the use of Duhamel as a confidential informant. Therefore, Duhamel's cooperation, if any, will only be a piece of this investigation and his cooperation will not accomplish all of the goals that will lead to a successful conclusion of this case. However, in furtherance of the investigation, we will continue to use Duhamel and look to develop other confidential informants." (*Id.* at ¶¶ 68-74; *see generally id.* at ¶¶ 64-74).

- Arrest and cooperation a member of the enterprise: "[T]here is not enough evidence to arrest any of the medical personnel . . . practicing at the 2 Wilson Place clinic and expect him/her to cooperate against any of the other members of the enterprise." (*Id.* at ¶ 76). In addition, "none of the evidence gathered to date against [lawyers and law firms] could sufficiently support a felony charge in which cooperation would be a more viable option." *Id.* "[I]t is possible to arrest Coles and Rose for the payment of referral fees pursuant to the Education Law involving paying to the 'leads,' . . . but at this stage it is difficult to believe that this would cause either of them to cooperate with our investigation into the organization at large." (*Id.* at ¶ 78; *see generally* ¶¶ 75-78).

- Indictment: "It would not be possible to bring an indictment against Coles or Rose at this stage, and any indictment against Robert Garris . . . would trigger the premature discovery of the underlying investigation and thus prevent us from gathering sufficient evidence to successfully prosecute the additional members of this enterprise." (*Id.* at ¶ 84; *see generally* ¶¶ 84-85).

- Arrest and cooperation of an accident victim: cooperation "would place any new 'victim' in the same shoes as the [undercover], who only dealt with Garris, the front line medical personnel and support staff for the attorney," and not the "operational managers of this enterprise." (*Id.* at ¶ 79; *see generally id.* at ¶¶ 79-81).

- Use of Undercover Officers: "At this time, while we do have other undercover officers to introduce into the enterprise, we do not currently have the connection to have another undercover officer introduced as an accident victim into the 2 Wilson Place clinic or one of the other clinics involved in this medical mill network." (*Id.* at ¶ 82). In addition,

35

"even if we did . . . we would not allow that [undercover] to undergo invasive medical

procedures."  (*Id.*; *see generally id.* at ¶¶ 82-83).

- Search Warrants: "without knowing all of the locations and entities utilized by Garris,

  Coles, Rose, Bill, George, Sholomov and their agents, accomplices, co-conspirators and

  others as yet unknown in furtherance of this criminal enterprise, we will not be able to

  fully realize the goals of this investigation, namely our ability to confirm the identities of

  all the individuals in this enterprise, to obtain probable cause for their arrests and

  prosecutions, and to learn of the locations and distribution of the proceeds of these

  crimes. Therefore, at this stage in the investigation, the premature execution of search

  warrants would thwart achievement of the objectives of this covert investigation by

  disclosing its existence."  (*Id.* at ¶ 88; *see generally id.* at ¶¶ 86-97).

## B.  Relevant Law

The *Rose* Opinion sets forth all the relevant law. A person has standing to suppress

communications intercepted by the Government where that person "was a party to any

intercepted wire, oral, or electronic communication or a person against whom the interception

was directed." 18 U.S.C. § 2510(11).[8] Before authorizing the interception of electronic

communications pursuant to Title III, a court must find that

> (a) there is probable cause for belief that an individual is committing, has
> committed, or is about to commit a [crime enumerated in 18 U.S.C. § 2516];
> (b) there is probable cause for belief that particular communications concerning
> that offense will be obtained through such interception;
> (c) normal investigative procedures have been tried and have failed or reasonably
> appear to be unlikely to succeed if tried or to be too dangerous; [and]
> (d) ... there is probable cause for belief that the facilities from which, or the place
> where, the wire, oral, or electronic communications are to be intercepted are being

---

[8] Gulkarov and Israilov do not dispute that they have standing only to move to suppress calls or
messages in which they were a participant.

used, or are about to be used, in connection with the commission of such offense
....

18 U.S.C. § 2518(3). The statutory requirement that "normal" investigative techniques be

addressed in wiretap applications is simply "'designed to assure that wiretapping is not resorted

to in situations where traditional investigative techniques would suffice to expose the

crime.'" *United States v. Serrano*, 450 F. Supp. 2d 227, 236 (S.D.N.Y. 2006) (quoting *United*

*States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).  The legislative history accompanying Section

2518 indicates that "normal investigative techniques" include, for example, standard visual or

aural surveillance techniques by law enforcement officers, general questioning or interrogation

under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial

groups by undercover agents or informants.  S. REP. NO. 90-1097 (1968), *reprinted in* 1968

U.S.C.C.A.N. 2112, 2190.

Courts must take a "commonsense approach" to the necessity requirement.  *United States*

*v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009).  Although "generalized and conclusory

statements that other investigative procedures would prove unsuccessful" do not suffice, "the

Government is not required to exhaust all conceivable investigative techniques before resorting

to electronic surveillance."  *Id.* (internal quotation marks and citation omitted); *see also United*

*States v. Trippe*, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("While generalized or conclusory

statements in an application are insufficient to support a showing of necessity, the application

must be viewed in a practical and common sense manner and need be only minimally adequate

to support the issuing judge's determination of necessity."  (internal citation omitted)).  "'The

statute only requires that the agents inform the authorizing judicial officer of the nature and

progress of the investigation and of the difficulties inherent in the use of normal law enforcement

methods.'"  *Id.* (quoting *United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999)).  There is no

requirement "'that any particular investigative procedures be exhausted before a wiretap may be authorized.'" *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997) (quoting *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987)).  "[A] reasoned explanation, grounded in the facts of the case, and which squares with common sense, is all that is required." *United States v. Scala*, 388 F. Supp. 2d 396, 404 (S.D.N.Y. 2005) (internal quotation marks and citations omitted).  "The issuing judge's determination that the Government has made adequate use of alternative investigatory techniques is entitled to substantial deference." *Trippe*, 171 F. Supp. 2d at 236 (citing *United States v. Wilkinson*, 754 F.2d 1427, 1433 (2d Cir. 1985)).

The Second Circuit has noted that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" *United States v. Fleishman*, No. 11 Cr. 32(JSR), 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011) (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)); *see also Steinberg*, 525 F.2d at 1131 ("[T]he very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future.").  Moreover, where – as here – a far-flung conspiracy is at work, the need for a wiretap may be compelling: "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." *United States v. Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

Defendants bear the burden of demonstrating that a wiretap application was deficient.  *United States v. Fea*, No. 10 Cr. 708(PKC), 2011 WL 1346981, at *4 (S.D.N.Y. Apr. 5, 2011) (citing *United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974) ("[T]he burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wiretapping was unlawfully employed.") (internal quotation marks and citation omitted)).

### C.  Discussion

The Moving Defendants argue that the Khaimov Wiretap should be suppressed because the D.A. allegedly failed to adequately explain one investigative technique: the use of a confidential informant or cooperating witness.  *See* Israilov Mot. at 8-12.  In support of that argument, their motion cherry picks words and phrases from the application to misleadingly create a picture that the investigator's "affidavit makes clear that the state's ability to use this cooperator to further its investigation of Khaimov was not only viable, but likely to succeed." *Id.* at 8.  As in *Rose*, a closer examination shows that Gulkarov and Israilov are wrong.

As previously noted, the investigators' affidavit set forth at length why law enforcement could not use confidential informants or cooperating witnesses to accomplish the goals of the investigation.  (*See* Feb. 3 2017 Cecchini Aff. ¶¶ 64-74).  The affidavit explains that law enforcement no longer had a viable source of information ("SOI") because a member of the conspiracy (*i.e.*, Garris) became suspicious that the SOI was working with law enforcement.  (*Id.* at ¶ 65).  Law enforcement likewise no longer had a viable confidential informant ("CI") because his case had "been disposed of, and since he did not receive a misdemeanor disposition, there is no incentive for him, nor are we asking him to continue to cooperate."  (*Id.* at ¶ 66). Moreover, even if the D.A. could still use these informants, "neither of these informants were able to ascertain any evidence against any medical personnel, whether at the 2 Wilson Place clinic or otherwise, . . . [who] were the controllers of this operation."  (*Id.* at ¶ 67).

The investigators' affidavit likewise described why use of a cooperating witness (the "CW") was insufficient to accomplish the goals of the investigation.  (*Id.* at ¶¶ 68-74).  The affidavit noted that the CW had "been in contact with Peter Khaimov . . . regarding the return of a check book and bank card for a bank account he opened for Coles shortly before being fired."

(*Id.* at ¶ 68).  Although the CW had "the ability to communicate with Khaimov and Alex Gulkarov," which was "helpful," the affidavit continued that "Khaimov has recently refused to meet with [the CW]."  (*Id.* at ¶ 72).  Moreover, even if the CW could meet with Khaimov, his assistance would be limited to "perhaps exposing portions of the fraudulent schemes."  (*Id.* at ¶ 73).  As such, he would be of little use in "other matters such as any agreements related to the referral and assignments of patients between clinic managers and attorneys, the identity of the owners, and any money laundering schemes between these actors in order to distribute the proceeds of these crimes may not become known solely through the use of [the CW] as a confidential informant."  (*Id.*)   Accordingly, the CW's "cooperation, if any, will only be a piece of this investigation and his cooperation will not accomplish all of the goals that will lead to a successful conclusion of this case."  (*Id.* at ¶ 74).

The affidavit's description is a "reasoned explanation" as to why "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed or to be too dangerous[,]" which "is all that is required."  *Rose*, 2021 WL 2117119, at *9 (quoting *Scala*, 388 F. Supp. 2d at 403-04 (internal quotation marks and citations omitted)).  The affidavit explained that Khaimov no longer appeared to be willing to meet with the CW, (Feb. 3 2017 Cecchini Aff. ¶ 72), and that the CW (a physician) could not elicit critical details about the scheme from Khaimov, including "agreements related to the referral and assignments of patients between clinic managers and attorneys, the identity of the owners, and any money laundering schemes between these actors in order to distribute the proceeds of these crimes," (*id.* at ¶ 74).  As the Court is well aware, "where – as here – a far-flung conspiracy is at work, the need for a wiretap may be compelling" because "'the clandestine nature of alleged conspiracies makes them

relatively less susceptible to normal investigative techniques.'" *Rose*, 2021 WL 2117119, at *9

(quoting *Feola*, 651 F. Supp. at 1105).

Accordingly, the Khaimov Wiretap should not be suppressed, because the investigators'

affidavit set forth at length the reasons why other means and methods—including confidential

sources—were not available, or could not accomplish the goals of the investigation.

### III.   The Court Should Deny Israilov's Motion to Sever His Case from Counts Four and Five of the Indictment on the Basis of Spillover Prejudice

Lastly, Israilov's Motion to sever his case from Counts Four and Five of the Indictment

should be denied.[9]  Israilov makes two arguments.  *First*, Israilov argues that failure to sever

would lead to unfair prejudice because Israilov was not charged with obstruction of justice or

making false statements to law enforcement.  Israilov Mot. at 13.  In his view, he will therefore

face "prejudicial spillover" that will allegedly cause the "jury to infer Mr. Israilov's knowledge

and intent on the underlying health care fraud scheme based on others' actions interacting with

law enforcement."  *Second,* Israilov argues that a failure to sever would inject potential *Bruton*

and *Crawford* confrontation issues into a joint trial, "since many of these false statements to law

enforcement cannot be neatly placed in the co-conspirator non-hearsay box, and would thus be

inadmissible against Mr. Israilov."  *See id.*

Factually, these arguments fundamentally misinterpret Israilov's role in the scheme,

substituting his senior status in the Indictment with the fanciful notion that the determination of

his guilt in the case will be impacted by the actions of other, lower-level individuals involved in

---

[9]  Count Four charges defendants Alexander Gulkarov, Anthony DiPietro, and Robert Wisnicki with a conspiracy in 2021 to obstruct justice during the federal grand jury investigation in this case.  Count Five charges an obstruction of justice-related offense against police officer and co-defendant Albert Aronov.

the conspiracy.  And legally, Israilov's arguments fail to meet his high burden of showing that a joint trial is inappropriate, especially in light of the strong presumption favoring joinder of multiple defendants charged with participating in a single conspiracy.  Accordingly, Israilov's motion for severance should be denied.

### A.  Applicable Law

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

> (a) Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

> (b) Joinder of Defendants.  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.[10]

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.

Balancing Rule 8 against Rule 14, "[t]here is a preference . . . for joint trials of defendants who are indicted together."  *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997).  "This preference is particularly strong where . . . the

---

[10]  Second Circuit "cases indicate that when a defendant in a multiple-defendant case challenges joinder of offenses, his motion is made under 8(b) rather than 8(a)." *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988) (internal quotations and citation omitted). This means that the acts alleged in the separate counts "must be 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.' " *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989).

defendants are alleged to have participated in a common plan or scheme." *See Salameh*, 152

F.3d at 115; *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988). As the Supreme Court has explained:

> Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more co-defendants. . . . It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *see also United States v. Zafiro*, 945 F.2d 881,

886 (7th Cir. 1991) (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the

costs associated from depriving the jury of making its determinations based on "the full

picture"), *aff'd*, 506 U.S. 534 (1993).

In order to prevail on a severance motion under Rule 14, a "'defendant must show not

simply some prejudice but *substantial* prejudice.'" *United States v. Sampson*, 385 F.3d 183, 190

(2d Cir. 2004). A defendant has the "extremely difficult burden" of showing that he would be so

prejudiced by joinder that he would be denied a fair trial. *United States v. Casamento*, 887 F.2d

1141, 1149, 1154 (2d Cir. 1989) (internal quotation marks and citation omitted). Consequently,

"[t]he principles that guide the district court's consideration of a motion for severance usually

counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).

Simply put, there is a strong and well-settled presumption that defendants who are

indicted together will be tried together. *See*, *e.g.*, *Zafiro*, 506 U.S. at 537; *United States v.*

*Blount*, 291 F.3d 201, 209 (2d Cir. 2002); *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999).

Given this presumption, the "prejudice" standard is difficult to satisfy.  That is, a defendant is

"not entitled to severance [under Rule 14] merely because [he] may have a better chance of

acquittal in [a] separate trial[]."  *Zafiro*, 506 U.S. at 540.  Nor is a defendant entitled to severance

simply because the evidence against his co-defendants is more damaging or voluminous than the

evidence against him.  *See*, *e.g.*, *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003).

Indeed, "joint trials involving defendants who are only marginally involved alongside those

heavily involved are constitutionally permissible."  *United States v. Locascio*, 6 F.3d 924, 947

(2d Cir. 1993).  And even if a particular defendant is somehow prejudiced by joinder, that

prejudice must be "sufficiently severe [as] to outweigh the judicial economy that would be

realized by avoiding lengthy multiple trials."  *United States v. Lanza*, 790 F.2d 1015, 1019 (2d

Cir. 1986) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)).  Thus, under

the Supreme Court's decision in *Zafiro*, a discretionary severance should be granted "only if

there is a serious risk that a joint trial would compromise a specific trial right of one of the

defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  506

U.S. at 539.

      In conspiracy cases, the Court's evaluation of the potential for substantial prejudice must

take into account that once a defendant is a member of a conspiracy, "all the evidence admitted

to prove that conspiracy, even evidence relating to acts committed by co-defendants, is

admissible against the defendant."  *Salameh*, 152 F.3d at 111.  For this reason, the mere fact that

evidence may be admitted concerning arrangements made by Israilov with other co-defendants,

or acts of fraud committed by the other defendants is not, standing alone, sufficient to warrant

severance.  "The fact that one of several codefendants is tried for a crime not committed by

another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]." *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996); *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.") (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)).  Further, even when the "risk of prejudice is high . . . less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Zafiro*, 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

### B. Discussion
#### 1. Severance is Not Warranted

Israilov argues that his case should be severed from Counts Four and Five because he is not charged with engaging in obstructive conduct with co-defendants Gulkarov, DiPietro, Wisnicki, and Aronov.  Israilov further argues that failure to sever would purportedly lead to "prejudicial spillover" due to the "disparity of the weight" between the evidence the Government is expected to present against Israilov, versus the evidence the Government will present at trial regarding the obstruction charges against the other defendants.  Israilov Mot. at 16.

Israilov misunderstands his role in the conspiracy and the strength of the evidence against him.  As an initial matter, the Government will demonstrate that Israilov's conduct was far more culpable than nearly every other defendant in the case, with the potential exception of Gulkarov

and Khaimov.[11]  Israilov was one the three senior leaders in the Gulkarov conspiracy, along with

co-defendants Gulkarov and Khaimov.  The evidence at trial will show that Israilov and

Gulkarov jointly established and controlled the No-Fault Clinics with Khaimov.  Indictment, ¶¶

8, 15.  Israilov personally paid and pressured the No-Fault Practitioners to prescribe unnecessary

medical treatments and services—including compound creams and durable medical equipment.

*Id.* at ¶¶ 30, 50.  Israilov further helped fill the Clinics with patients by paying runners to bribe

hospital employees, 911 operators, and the like.  *Id.* at ¶ 50.  Moreover, to hide the existence of

the scheme, Gulkarov and Israilov repeatedly arranged for the No-Fault Practitioners to lie under

oath about the Gulkarov Conspirators' illegal control of the Clinics.  *Id.* at ¶¶ 19-20.

Contrary to the assertions in his severance motion, the evidence against Israilov is strong.

As counsel is aware, the Government's evidence at trial against Israilov will include testimony

from as many as eight cooperating and immunized witnesses.  The jury will hear firsthand how

Israilov arranged for runners to pay bribes to hospital employees, 911 operators, and similar

individuals with access to accident information.  The jury will also hear how Israilov recruited

medical practitioners into the scheme, took over their practices, paid or instructed them to

prescribe unnecessary medical treatments, and coached them to lie under oath.  The jury will

further hear Israilov on recordings and see Israilov's text messages during which he discusses the

scheme, and will be able to examine Israilov's bank accounts and see how he personally made

hundreds of thousands of dollars from the scheme.

As such, the idea that Israilov will be found guilty merely because some of his co-

conspirators are charged with making false statements and obstruction is spurious.  Indeed, the

---

[11] The Government's investigation is ongoing. As such, the Government may learn additional information about the relative culpability of co-defendants that could affect its position regarding relative culpability.

fact that Israilov is *not* charged with these offenses acts toward his benefit at trial.  If, as Israilov asserts, the "only reason for his co-defendants to falsify documents and intentionally present fabricated evidence and testimony to the grand jury, or make false statements to interviewing law enforcement agents was to conceal their criminality in the underlying health care fraud scheme," Israilov Mot. at 15, then Israilov's lack of participation in these crimes would constitute evidence that he was not engaged in the underlying health care fraud offense.

Furthermore, the evidence involved in the obstruction and false statements charges is hardly inflammatory.  The jury will hear that several of Israilov's co-defendants lied to law enforcement and conspired to obstruct the Government's investigation.  This is not any more sensational than the evidence the Government expects to present against Israilov—particularly where Israilov is charged with the much more serious offense of conspiring with others to prescribe patients medically unnecessary and painful treatments.  *See United States v. Stein*, 428 F.Supp.2d 138, 144 (S.D.N.Y. 2006) (rejecting multiple severance motions based on, *inter alia*, joinder of obstruction counts against co-defendants because the obstruction counts were "not particularly inflammatory" with regard to the overall scheme).

Lastly, the Court can easily remedy any potential prejudice to Israilov by giving a jury instruction that to convict, the jury "must consider the counts separately and find that the government has proven each case beyond a reasonable doubt."  *United States v. DeSalvo*, 797 F. Supp. 159, 169 (E.D.N.Y. 1992) (denying severance of obstruction claims); *see Stein*, 428 F. Supp. 2d at 144 (denying severance of obstruction claims because, among other things, "appropriate limiting instructions likely would eliminate spillover prejudice between defendants and counts."); *United States v. Molina*, 789 F. Supp. 106, 110 (E.D.N.Y. 1992), *aff'd,* 48 F.3d

1213 (2d Cir. 1994) ("the Court can instruct the jury to consider the guilt of each defendant, and each count of the superseding indictment, individually.").

Accordingly, given Israilov's senior role in the conspiracy, there is no basis to sever his case from the charges brought against other co-conspirator defendants.

## 2.  The Defendants' *Bruton* and *Crawford* Claims Are Meritless

Israilov additionally moves for a severance on the ground that the Government will purportedly introduce obstructive statements relating to Counts Four and Five, which Israilov asserts are inadmissible against him because they present "thorny *Bruton* and *Crawford* constitutional issues."  Israilov Mot. at 18.  In particular, Israilov asserts that it is improper for the Government to introduce statements by co-defendants Aronov and Wisnicki during which they lied to law enforcement and in the grand jury, respectively.  *Id.* at 17.

The Second Circuit squarely rejected Israilov's contention in *United States v. Stewart*, 433 F.3d 273, 291 (2d Cir. 2006).  There, defendants Martha Stewart and Peter Bacanovic were charged with, among other offenses, making false statements to law enforcement and obstruction.  At their joint trial, the Government introduced their respective statements to law enforcement—including both true and false statements.  The defendants appealed their convictions arguing that the introduction of each other's out-of-court statements violated *Crawford*, and the Second Circuit easily disposed of the challenge.  As the Second Circuit noted, the "Defendants do not have the temerity to argue that somehow *Crawford* precludes the government's proof of the Defendants' false portions of their statements because they were provided in a testimonial setting."  *Id.*  This is because "*Crawford* expressly confirmed that the categorical exclusion of out-of-court statements that were not subject to contemporaneous cross-examination does not extend to evidence offered for purposes other than to establish the truth of

the matter asserted." *Id.* The Second Circuit likewise disposed of the defendants' argument that "that certain truthful portions of their statements made during the course of the agreed-upon obstruction must be excluded because they are 'testimonial.'" *Id.* As the Second Circuit reasoned, "The truthful portions of statements in furtherance of the conspiracy, albeit spoken in a testimonial setting, are intended to make the false portions believable and the obstruction effective." *Id.* at 292. "Thus, the truthful portions are offered, not for the narrow purpose of proving merely the truth of those portions, but for the far more significant purpose of showing each conspirator's attempt to lend credence to the entire testimonial presentation and thereby obstruct justice." *Id.* "It would be unacceptably ironic to permit the truthfulness of a portion of a testimonial presentation to provide a basis for keeping from a jury a conspirator's attempt to use that truthful portion to obstruct law enforcement officers in their effort to learn the complete truth." *Id.* at 292-93. As such, the Second Circuit held that "when the object of a conspiracy is to obstruct justice, mislead law enforcement officers, or commit similar offenses by making false statements to investigating officers, truthful statements made to such officers designed to lend credence to the false statements and hence advance the conspiracy are not rendered inadmissible by the Confrontation Clause." *Id.* at 293.

Here, the Government intends to introduce evidence at trial that co-defendant Aronov was a police officer during the period of the charged bribery conspiracy who unlawfully provided confidential information of motor vehicle accident victims to the Gulkarov Conspirators. The Government will further introduce evidence that law enforcement approached Aronov in or about 2021, during which Aronov lied to law enforcement and told them that he had never improperly disclosed any such information, in order to conceal the bribery scheme (of which Israilov was a part). This is a quintessential *false* statement made to law enforcement to

further the conspiracy, and accordingly falls outside the scope of the Confrontation Clause. *Stewart*, 433 F.3d at 291.

Similarly, the Government intends to introduce evidence that co-defendant Wisnicki was an attorney during the period of the charged healthcare fraud and money laundering conspiracies. The Government's evidence will show that Israilov, among other things, used Wisnicki's law firm to launder proceeds from the Clinics to conspirators through a series of phony legal representations.  The evidence will show that the Government served Wisnicki with grand jury subpoenas for documents and testimony, after which Wisnicki falsified engagement letters and provided them to the grand jury.  Wisnicki then testified in the grand jury and falsely stated, among other things, that the legal representations were genuine in order to conceal the money laundering and healthcare fraud conspiracy.  Once again, these are quintessential *false* statements and obstruction to further the conspiracy (of which Israilov was a part), and accordingly fall outside the scope of the Confrontation Clause.  *Stewart*, 433 F.3d at 291.

Lastly, even if the Second Circuit's decision in *Stewart* were not controlling, there is no *Bruton* issue because neither Aronov nor Wisnicki implicated Israilov in their false testimony. The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him."  Accordingly, "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).  As such, in *Bruton v. United States*, 391 U.S. 123, 135-36 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession naming the defendant as a perpetrator at their joint trial violates the latter's Sixth Amendment right to cross-examination. On the other hand, where a "confession was not incriminating on its face, and became so only when linked with evidence

introduced later at trial (the defendant's own testimony)," there is no *Bruton* issue.  *Richardson*, 481 U.S. at 208.

The Supreme Court's decision in *Bruton* is inapplicable here because neither Aronov nor Wisnicki made a confession to law enforcement or in the grand jury.  They falsely denied any misconduct and did not make any incriminating statement about Israilov.  As such, there is no constitutional challenge, and Israilov's severance motion on this ground should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motions should be denied in their entirety.

Dated:  New York, New York
          January 19, 2023

                       Respectfully submitted,

                       DAMIAN WILLIAMS
                       United States Attorney
                       Southern District of New York

By: _____/s/_____
        Mathew Andrews
        Louis A. Pellegrino
        Assistant United States Attorneys
        Southern District of New York
        (212) 637-6526 / 2617